**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1248-18T2

SANDRA PENNISE,

    Plaintiff-Appellant,

v.

AMERICAN WATER WORKS
SERVICE COMPANY, INC.,

    Defendant-Respondent.

_____

Argued November 4, 2019 – Decided January 16, 2020

Before Judges Geiger and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-0315-16.

Laura Carlin Mattiacci argued the cause for appellant (Console Mattiacci Law, LLC, attorneys; Laura Carlin Mattiacci and Katherine C. Oeltjen, on the briefs).

Richard R. Harris, of the Pennsylvania Bar, admitted pro hac vice, argued the cause for respondent (Littler Mendelson, PC, attorneys; Richard R. Harris and Rachel Fendell Satinsky, on the brief).

PER CURIAM

Following a five-day trial, a jury returned a verdict in favor of defendant American Water Works Service Company, Inc., finding it did not unlawfully discriminate against plaintiff Sandra Pennise based on her age. Plaintiff appeals from a subsequent order denying her renewed motion for judgment notwithstanding the verdict (JNOV) and her alternative motion for a new trial.

On appeal, plaintiff argues the trial court erred in denying JNOV because the jury's verdict was against the weight of the evidence and reasonable minds could not differ as to the result. Plaintiff also argues the trial court erred in denying her motion for a new trial because a miscarriage of justice resulted from the court: (1) not disclosing the scope of its relationship with a juror until after the jury rendered its verdict; (2) mistreating plaintiff's counsel; and (3) making erroneous evidentiary rulings. For the following reasons, we affirm.

I.

Defendant is a water and wastewater utility company. In 2001, plaintiff began working for defendant as a "team lead" in its Utility Plant Accounting (UPA) group. In 2008, defendant demoted plaintiff to senior accountant in the UPA group. At the time, defendant employed accountants for its UPA and general accounting (GA) groups. UPA accountants primarily dealt with fixed assets while the general accountants performed broader accounting functions.

In 2010, Nancy Yilmaz became a UPA manager. Plaintiff alleged Yilmaz demonstrated bias against older workers almost immediately after becoming a UPA manager. Plaintiff further alleged she and other concerned employees unsuccessfully approached Yilmaz to address her perceived age bias.

In or about February 2014, plaintiff learned of defendant's forthcoming reorganization (the Redesign) in which defendant sought to implement SAP, an automated finance software system. As part of the Redesign, defendant combined its GA and UPA groups with the retained post-Redesign accountants performing both functions. Because of the efficiencies gained through implementing SAP, UPA constituted only ten to twenty percent of the post-Redesign accounting work.

Following the establishment of a new organizational chart, defendant required employees to apply for managerial positions. Defendant selected Michael McKeever, Nancy Yilmaz, Brian Moran, Nicole DeFeo, and Anne McAteer as its accounting managers.

In April or May 2014, defendant's managers met to rate non-managerial accountants for the new post-Redesign accountant positions (the 2014 Meeting). During the meeting, defendant's managers used a spreadsheet to rate those employees based on criteria including technical skills, behavior, overall

performance, and leadership/teamwork. Using a scale of one for lowest and five for highest, the managers collectively scored plaintiff three for technical skills, one for behavior, two for overall performance, and one for leadership/teamwork. Plaintiff's combined score was the lowest of all senior accountants. After rating the employees, defendant's managers submitted their proposal to human resources and the legal department for review.

On May 15, 2014, defendant notified plaintiff she was not selected for an accountant position and would be laid-off. Plaintiff was fifty-eight years old at the time.

Defendant offered plaintiff temporary, month-to-month employment following the Redesign, which plaintiff accepted. Several other employees accepted similar temporary employment. Plaintiff remained in the temporary position until August 2015. During that time, plaintiff trained Eileen Winton, a post-Redesign accountant who assumed plaintiff's duties. Winton was rated the highest performer in the GA group and is older than plaintiff.

On her last day of work, plaintiff reviewed documents attached to her severance package containing information made available pursuant to the Older Worker Benefit Protection Act of 1990. The documents included a release of claims form and the ages of the employees retained and laid off as part of the

Redesign. After reviewing the documents, plaintiff concluded defendant terminated her based on her age.

In January 2016, plaintiff filed a one-count complaint against defendant alleging age and sex discrimination in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49.[1] Notably, plaintiff did not allege that defendant engaged in retaliation.

Defendant answered, denying plaintiff's claims. Following discovery, defendant moved for summary judgment. On March 2, 2018, the trial court denied the motion.

The trial commenced on August 14, 2018. During jury selection, the following exchange took place between the trial judge and prospective juror, R.C.:[2]

> THE COURT: Next, here's trouble. We got number 717, R.C. [R.C.], have a seat. Now, I don't always take liberties with making fun of my jurors like I have [R.C.] from the moment he walked in. But we've known each other quite too long. And we're friends, [R.C], aren't we?
>
> R.C.: Well, you would say that.

---

[1] Plaintiff voluntarily dismissed her sex discrimination claim prior to trial.

[2] We refer to the juror by initials to protect his privacy.

A-1248-18T2

THE COURT: I would say that. And I knew that was coming. But how you doing?

R.C.: Good. How are you?

THE COURT: Everybody's – I'm doing well, I'm doing well. Any issues with [questions] number 1 or 2?

R.C.: No.

THE COURT: You'd be able to serve with us?

R.C.: Yes.

THE COURT: It would be a pleasure. Because we know each other, and we've known each other for a long time and we actually worked together in different capacities and the like over the years, you would make up your own mind relative to the case based on the facts, correct?

R.C.: Yes.

THE COURT: But you would follow my instructions on the law even if you thought that, you know, maybe you knew the law better than me.

R.C.: Unlike other times, yes.

THE COURT: All right. Thank you. All right. [R.C.], thank you.

After R.C. answered other preliminary questions indicating he could be fair and impartial, another exchange took place:

THE COURT: Now, we've already explored the fact that R.C. and I know each other. And we've already –

oh, [R.C.], every once in a while when [R.C.] is trying to stay in shape I'll run into him at . . . the gym at the high school. And, of course, we agree. If we do --

R.C.: That's because he's faster than I am and he can run out.

THE COURT: If we do see each other, we'll agree we're not going to speak about this matter.

R.C.: Correct.

Plaintiff did not request to ask additional questions of R.C. at sidebar, did not request R.C. be removed from the panel for cause, and did not exercise an available peremptory challenge to remove R.C. Instead, she used all her peremptory challenges on six other prospective jurors. R.C. was seated as Juror No. 4.

Because of the nature of plaintiff's arguments on appeal, we briefly summarize the testimony of the witnesses who testified at trial.

Plaintiff called McKeever, defendant's identified corporate designee, as her first witness. At sidebar, counsel requested that she be permitted to question McKeever and defendant's other current and former employees through leading questions. Defendant objected. The trial court sustained the objection, barring plaintiff from using leading questions unless the witness became "hostile," was "not forthcoming," or "attempt[ed] to evade." The purpose of testimony, the

7

court reasoned, "is so that the [jury] can assess credibility" and "[l]eading questions on direct do not give the jury an opportunity to hear how [the witness] is responding."

McKeever testified he participated in the 2014 Meeting but did not personally rate plaintiff, noting he was a manager in the GA group prior to the Redesign and thus had limited interactions with plaintiff. McKeever explained that at the 2014 Meeting,

> there was a spreadsheet. We had some set criteria that we worked with H.R. on for specific individuals. . . . Each of the accountants were rated on those criteria and then we found, based off of the ratings, where we thought they would best be slotted in the new organization and we came to a conclusion as a group and we submitted our proposal to H.R. and legal for review.

McKeever also explained that when SAP was implemented "not everything [was] working as it should right away" so plaintiff, during her month-to-month employment, "filled in and she helped work through some of those defects, covering some of the manual processes that were going to be automated in the future once they were fully integrated." McKeever further noted plaintiff transferred her UPA knowledge to other accountants and acknowledged he did not hear any complaints regarding plaintiff during that time.

A-1248-18T2

Exhibit P-31 is a spreadsheet purportedly used during the 2014 Meeting to rate employees. McKeever testified he viewed only a portion P-31 during the meeting. According to McKeever, P-31 contained additional criteria, including employees' ages, which was not on the spreadsheet he used. Following that testimony, plaintiff unsuccessfully moved to admit P-31 in evidence.

During cross-examination, McKeever explained the Redesign resulted from defendant's implementation of an automated finance software known as SAP. McKeever noted UPA accountants were primarily responsible for fixed assets, which consisted of clerical and bookkeeping duties, while general accountants had a broader scope of duties. After the Redesign, the GA group absorbed the UPA group and the new accountant role consisted of approximately seventy-five percent GA and twenty to twenty-five percent UPA. McKeever further testified that the scorers at the 2014 Meeting considered technical skills, performance reviews, behaviors, and general teamwork, but not age.

Plaintiff called Yilmaz as her second witness. Prior to the Redesign, Yilmaz was a UPA manager. Yilmaz noted she was involved in the selection process but did not participate in the 2014 Meeting because she was on vacation.

Yilmaz explained that SAP automated most of the UPA duties. As a result, the post-Redesign accounting positions primarily engaged in broader GA

duties. According to Yilmaz, plaintiff "was not selected for one of those positions because she did not demonstrate the skills and the behaviors required for the available roles . . . in the new group."

At plaintiff's request, Yilmaz read to the jury various positive comments contained in plaintiff's 2011 and 2012 performance reviews, and Yilmaz further acknowledged plaintiff received commendable reviews in 2013 and 2014. Nevertheless, Yilmaz maintained plaintiff was not qualified for any post-Redesign accounting roles and noted plaintiff was "doing the bare minimum" in 2014. Finally, Yilmaz denied any employee approached her with an age bias complaint.

Regina Slawinski worked as a senior accountant for defendant from 2008 to 2011. Slawinksi testified she, along with other co-workers including plaintiff, noticed Yilmaz began giving preferential treatment to younger male employees when Yilmaz assumed the UPA manager role in 2010. Slawinksi further testified they (Slawinksi, plaintiff, and other senior accountants) unsuccessfully approached Yilmaz to address the alleged bias issue. At the time she testified, Slawinksi was sixty years old.

On direct, plaintiff testified she had GA experience prior to working for defendant. She disagreed the UPA and GA positions consisted of different skill

sets. According to plaintiff, both the UPA and GA accountants "did the same tasks" and "had the same responsibilities."

Further, plaintiff testified that she and other accountants unsuccessfully approached Yilmaz to address concerns regarding Yilmaz's alleged bias against older employees. Additionally, plaintiff testified she believed her termination was the result of age discrimination after reviewing documents attached to her severance package, including a release form and a list of employees laid-off and retained, which stated their ages. Finally, plaintiff stated she performed both the fixed asset (including transferring knowledge) and GA duties during her month-to-month temporary employment.

During cross-examination, plaintiff testified she considered her switch to senior accountant more of a "position change" rather than a demotion despite losing supervisory responsibilities. After reviewing a list of employees, along with their age and whether they were retained or laid-off, plaintiff acknowledged a "majority" of those retained after the Redesign were over forty years old.

Plaintiff next called Elba Deck. At the time of the 2014 Meeting, Deck was the director of financial planning and analysis. Deck noted she recommended plaintiff be terminated at the 2014 Meeting but indicated the overall score for each employee resulted from "a group decision with group

11

input." Deck explained plaintiff "was very efficient at . . . UPA, and that was the niche. But going into [GA], and understanding [GA] concepts, that is the area that [plaintiff] did not have the technical expertise that [defendant] needed" for the new accounting role. Further, Deck stated she previously rated plaintiff as a "low performer" based on her interactions with plaintiff.

Plaintiff's counsel again moved for the admission of P-31 after Deck testified the document contained more criteria than the spreadsheet used at the 2014 Meeting which, according to Deck, only included technical, behavioral, overall performance, and teamwork/leadership. Defendant objected, contending that P-31 was not the spreadsheet used during the 2014 Meeting and contained demographic information, such as the employee age, that was not listed on the spreadsheet used during the meeting.

At sidebar, the court noted that plaintiff did not lay the proper foundation by asking Deck whether P-31 existed, in its entirety, at the 2014 Meeting. The trial court explained, while still at sidebar:

> you're going to have to lay a foundation, based on a
> point in time, as to, you know, how it was created, . . .
> if things were added on at a different point in time.
>
> . . . .
>
> And you fail to understand, also, just because
> they provided it to you in discovery, and even if it's

something that's in the normal course of business, that you don't understand is in the normal course of business, if this witness didn't understand that it was kept in the normal course of business, then you don't have the right person authenticating the document.

. . . .

Well, you're going to have to create that foundation before you get it in, that's my point then.

Thereafter, plaintiff's counsel renewed her application to ask Deck leading questions. The court again denied her application, stating:

[N]obody in this matter has done anything except be completely forthcoming. . . . The record's completely barren of any not giving you answers to your questions. Should that happen, should you undertake a line of questions and someone . . . not provide you with an answer or they attempt to be evasive in some way, you could renew your application.

But . . . that's not the way we try a case in my courtroom by leading questions. The jury . . . [has] a right to hear the words, the evidence from the mouth of the witnesses to assess their credibility, not to hear a prepared written questions crafted by an attorney to which that person can basically say yes or no. That's no way for any jury to attempt to asses credibility in the case.

Later, the following exchange took place between the trial judge and R.C. in the presence of the jury:

A-1248-18T2

THE COURT: [E]veryone knows that I know juror number 4, [R.C.], [I] ran into a mutual friend,. . . but I didn't mention to him that we were on the panel.

R.C.: And I, too saw [him] and not a word was said on either side.

THE COURT: And that's what you're supposed to do. And the two of us know each other. So we're abiding by the rules, something that we aren't typically known to do, but there you have it.

R.C.: All right. Just leave that amongst ourselves.

THE COURT: Well, that's different, that's different. You never played basketball with this guy. Anyway, okay . . . we'll move forward.

Plaintiff's counsel then proceeded with her direct examination of Deck. Deck maintained P-31 was not the spreadsheet used during the 2014 Meeting, noting the actual spreadsheet she used did not contain a column for gender or age. Deck further indicated plaintiff received the following scores, ranging from one (lowest) to five (highest): three for technical; one for behavioral; two for overall performance; and one for teamwork/leadership.

During a later portion of Deck's testimony, plaintiff moved to admit the part of P-31 in evidence that contained the rating scores. That part of P-31 was moved in evidence without objection.

During cross-examination, Deck described plaintiff's UPA position as "manual" while the post-Redesign accountants required complex accounting skills which plaintiff did not possess. Deck noted that her assessment of plaintiff was based on her interactions with plaintiff and feedback from other accounting managers. Additionally, Deck testified age was not a factor in the decision-making process, stating: "We were too busy. We needed people to get the job done. So it didn't matter to us your age. None of that is relevant. It was your skill set and your ability to fit in the team."

Anna McAteer testified that she participated in the 2014 meeting; at the time she was an accounting manager. McAteer testified age was not a factor during the rating process and did not recall discussing plaintiff's scores. McAteer noted she worked with plaintiff after the Redesign and considered plaintiff's performance "limited." McAteer also stated plaintiff did not perform the duties of a post-Redesign accountant; plaintiff focused on UPA duties and did not perform GA duties.

Plaintiff next called Nakazzi Ramashala who, during the Redesign, worked in defendant's human resources department. Ramashala did not participate in the 2014 Meeting. She testified that P-31 was the spreadsheet provided to legal and not the version utilized by the managers during the rating

15

process, noting the managers did not have access to the employees' ages. At this point, the court admitted the entirety of P-31 in evidence.

After plaintiff rested, defendant moved for judgment regarding plaintiff's claims for punitive damages, emotional distress, and age discrimination. The court dismissed plaintiff's claim for punitive damages but not her claims for emotional distress and age discrimination.

Defendant called Nicole DeFeo, an accounting manager, who supervised plaintiff after the Redesign. DeFeo described plaintiff's UPA position as "straight forward" and not involving much subjectivity. DeFeo noted plaintiff transferred her UPA knowledge to other accountants but did not perform GA duties. DeFeo testified plaintiff's performance was "limited" capacity-wise and plaintiff's behavior was "difficult." Based on her supervision of plaintiff, DeFeo testified plaintiff was not qualified for a post-Redesign accountant role. Finally, DeFeo testified she did not consider plaintiff's age at any point.

Defendant next called John Houseman, an accounting manager. Houseman participated in the 2014 Meeting. He testified that based on his limited interactions with plaintiff, and the input offered by other managers present at the meeting, he agreed with the low score plaintiff received.

16

Houseman testified neither plaintiff's age, nor any employee's age, was discussed during the meeting.

Defendant's final witness was Eileen Winton. Prior to the Redesign, Winton was a senior accountant in the GA group. She received a post-Redesign accountant position. At the time, Winton was approximately sixty-one years old. Winton indicated plaintiff provided her with UPA knowledge after the Redesign. Winton described her time working with plaintiff as difficult. Winton testified she did not observe plaintiff performing any GA duties post-Redesign.

After Defendant rested, both parties moved for directed verdicts. The trial court denied the motions.

Following closing arguments, the court provided the following curative instructions concerning statements made by plaintiff's counsel.

First, in response to plaintiff's reference to her performance reviews, the court instructed the jury to disregard the 2013 performance review that plaintiff's counsel mentioned because it is "not in evidence. You're not going to see a 2013 performance review" and it "is not something you can base your decision on. You're going to get the performance reviews that are in evidence, and you can consider them."

17

Second, in response to plaintiff's statement that older employees felt retaliated against after approaching Yilmaz with their age bias concerns, the court advised the jury that this matter involves only "a claim based on illegal discrimination, based on age," and not a retaliation claim. "[A]ny belief or any idea or any commentary regarding retaliation is not something that's at play here, and that you should not consider."

Finally, in response to plaintiff's "David versus Goliath" metaphor, the court instructed the jury that all parties, "whether it's an individual litigant or a corporate litigant," are "entitled to the same rights and the same privileges. Everybody is treated -- even a corporation, . . . as an individual in the eyes of the law."

The jury returned a seven-to-one verdict in favor of defendant. After dismissing the jury, the trial judge noted he worked with R.C. in other capacities, including serving on a board together, and that he (the judge) served as mayor while R.C. served as school board president in the same municipality. The court further stated:

> We understand confidential information, we understand responsibilities and context. And we've worked in circumstances before where we have not been able to share information with each other and we take that seriously, despite having a . . . social relationship to the extent that I see him, and I say hello and we talk about

A-1248-18T2

each other's families and kids and things like that. And I'm sure that's what it'll be about if we do speak. But I can assure you we will not speak about this case.

Plaintiff immediately moved for a mistrial and for JNOV. Regarding the motion for a mistrial, plaintiff's counsel claimed she "did not know the scope of the relationship" between the trial court and R.C. She accused the trial court of mistreating her, which "may [have] influenced the jury." Regarding the motion for JNOV, counsel argued the jury's verdict was "against the weight of the evidence" and "no reasonable jury could conclude anything other than that [plaintiff's] age played a role in the decision . . . to lay her off." The trial court denied both motions.

On September 11, 2018, plaintiff renewed her motion for JNOV and alternatively moved for a new trial. Plaintiff argued she was entitled to a JNOV because "the jury's verdict was against the weight of the evidence and reasonable minds could not differ as to the result." According to plaintiff, she "presented ample evidence that it was more likely than not that her age was a determinative factor in her termination amid the [d]efendant's scheme to eliminate older accountants from its workforce."

Alternatively, plaintiff contended she was entitled to a new trial because the court: (1) did not disclose the scope of its relationship with R.C. until after

19

the jury rendered its verdict; (2) mistreated plaintiff's counsel; and (3) made erroneous rulings regarding counsel's use of leading questions on direct, the admissibility of P-31, and the curative instructions.

Following oral argument, the trial court issued an oral decision and order denying both motions. Regarding plaintiff's "weight of the evidence" argument, the judge found plaintiff did not "establish a clear and convincing miscarriage of justice" resulted from the jury's verdict. The judge noted neither party produced an expert to analyze the statistical data presented at trial. The judge further stated:

> [D]efendant[] produced Ms. Winton, and she was . . . retained in the restructure of the Finance Division, who actually [was] older than the plaintiff. The defendant also presented evidence that the plaintiff had been hired in a role that had supervisory duties, but she had been relieved of those duties. The defendant presented other factors regarding the plaintiff, regarding her limited general accounting experience, her limited analytical experience.
>
> . . . .
>
> Now a jury making credibility determinations in favor of the defendant's version of the evidence could reasonably conclude from that that the defendant terminated the plaintiff, not based on her age, but based on lack of skill, and based on the fact that the defendant did, in fact, retain the more skilled Ms. Winton, despite her age.

Accordingly, this [c]ourt does not find . . . any clear and convincing evidence of a miscarriage of justice. A reasonable jury could certainly have found that the defendant's witnesses and facts were more credible than plaintiff's proofs . . . .

Regarding R.C., the judge stated that "from the outset" he "made it clear that [they] had a longtime . . . friendship" and "worked in different capacities together over the years." The judge noted "[p]laintiff's counsel made no requests or inquires of the [c]ourt regarding the nature of the relationship[,] didn't ask the [c]ourt to excuse [R.C.] for cause[, and] didn't use one of its six peremptory challenges to strike." The judge also noted plaintiff's counsel was assisted by two other attorneys during jury selections. The judge further indicated both he and R.C. "encounter[ed] a mutual friend at different times during the trial, [and] neither informed their friend that they were involved in the same litigation." The judge further stated:

Plaintiff's counsel has not demonstrated, in any way, how [R.C.] being on the panel has, in any way, prevented [plaintiff] from getting justice in the case. There has been nothing indicated as to how [R.C.] being on the panel impacted the jury, other than the fact that he voted in favor of the defense. . . .

And nothing came forward like from the jury that there were any questions or concerns about the manner in which deliberations were going on, that anybody felt that they were being unduly pressured, that any of the

21

jurors felt that there was any improprieties in the process.

. . . .

It would appear that, being unable to accept the jury's verdict, the plaintiff and her attorneys are seeking to make an issue where none exists, and to find fault with the [c]ourt for what the jury decided was plaintiff's lack of credible proofs on the issue. Plaintiff has shown no evidence that [R.C.] being on the panel caused any injustice to her client whatsoever, let alone by the required standard of clear and convincing evidence.

Regarding the mistreatment allegation, the judge first rejected plaintiff's attempt to raise an issue for the first time during deliberations, concerning Juror No. 7's[3] alleged inappropriate comment during a sidebar that plaintiff's counsel was cute.[4] The court noted it was unable to deal with the issue because it was not raised by counsel prior to deliberations.

Next, the court addressed plaintiff's "complain[t] about the abrupt manner in which [plaintiff's counsel] was summoned to sidebar," stating:

I typically economize my use of words. But if I see something . . . in the courtroom in front of a jury, I will be short because I want as little said as possible in front of the jury, when I want to stop an attorney from saying something, or when I want to stop a witness from saying

---

[3] As noted earlier, R.C. was Juror No. 4.

[4] The record does not reflect the actual statement made by Juror No. 7.

something that I don't believe the jury should hear. I will be short, and I will be abrupt.

None of the commentary that [plaintiff's counsel] complain[s] about was said before the jury; that was all at sidebar or out of the presence of the jury, when the jury was excused, so as not to have the jury have to see or hear anything relative to that.

The judge further noted he "instructed the jury that they shouldn't consider any comments or rulings by the [c]ourt in their decision-making process." The judge also stated he instructed the jury "that the matter shouldn't be decided based upon the performance of the attorneys or any bias that may be developed for or against either side."

While the jury was deliberating, defendant moved for curative instructions. The judge noted co-counsel "was quite obviously displeased with something I was saying, and began making . . . obvious and notorious facial expressions, as if to show, not only disagreement, but disgust at the [c]ourt's comments." This entire sequence occurred outside the presence of the jury.

The judge then recounted the curative instructions provide after closing arguments, as stated above.

Next, the judge addressed the evidential rulings. Regarding the admissibility of P-31, the judge stated "[i]t appeared that [plaintiff's counsel] didn't appreciate the necessity of a proper foundation for a business record to be

admitted."   The judge noted P-31 was ultimately admitted once plaintiff's counsel laid a proper foundation.  Regarding use of leading questions, the judge stated:

> I informed counsel that I would require non-leading questions to begin with for all witnesses that were called, if they were from the defendant's case, being called in the plaintiff's case, or vice versa.  In order to make the presentation effective for the ascertainment of the truth, I wanted the jury to hear the facts and the testimony as related by each witness, and not just by the witness saying yes or no to leading, fact-laden questions posed by counsel.  I believe this to be important, in order for the jury to be able to discern credibility.  Both parties were informed that, in the event a witness became hostile or unresponsive, they could request leading questions at such time.

This appeal followed.  Plaintiff raises the following points on appeal:

POINT I

THE TRIAL COURT ERRED IN DENYING PLAINTIFF'S MOTION FOR A NEW TRIAL BECAUSE A MISCARRIAGE OF JUSTICE RESULTED FROM THE TRIAL COURT'S FAILURE TO FULLY AND ADEQUATELY DISCLOSE ITS RELATIONSHIP WITH A JUROR.

POINT II

THE TRIAL COURT ERRED IN DENYING PLAINTIFF'S MOTION FOR A NEW TRIAL BECAUSE A MISCARRIAGE OF JUSTICE RESULTED FROM THE TRIAL COURT'S HOSTILE TREATMENT OF PLAINTIFF'S COUNSEL AND

24

MULTIPLE ERRONEOUS EVIDENTIARY RULINGS.

## II.

We first address the denial of plaintiff's motion for judgment notwithstanding the verdict (JNOV). Plaintiff argues the trial court erred because she was entitled to a JNOV because "the jury's verdict was against the weight of the evidence and reasonable minds could not differ as to the result." We disagree.

Our review of the denial of a motion for JNOV under Rule 4:40-2 is de novo "although we defer to the trial court's feel for the evidence." Lechler v. 303 Sunset Ave. Condo Ass'n, 452 N.J. Super. 574, 582 (App. Div. 2017).

In reviewing the denial of a motion for JNOV, "we apply the same standard that governs the trial court." Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016) (citations omitted). That standard requires that "if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied." Ibid. (quoting Verdicchio v. Ricca, 179 N.J. 1, 30 (2004)). We do not consider the "worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to

the party opposing the motion." Lechler, 452 N.J. Super. at 582 (quoting Dolson v. Anastasia, 55 N.J. 5-6 (1969)).

Plaintiff's argument is without merit. Accepting as true all the evidence supporting defendant's position, and according it the benefit of all reasonable inferences, a reasonable jury could easily find defendant did not subject plaintiff to unlawful age discrimination. Accordingly, the trial court properly denied plaintiff's motion for JNOV.

## III.

We next address plaintiff's argument that the trial court erred in denying her motion for a new trial because a miscarriage of justice resulted from the court: (1) not disclosing the scope of its relationship with R.C. until after the jury rendered its verdict; (2) mistreating plaintiff's counsel; and (3) making erroneous evidentiary rulings that cumulatively deprived her of a fair trial. In doing so, we are mindful that the jury's determination whether defendants engaged in age discrimination is highly fact sensitive.

Rule 4:49-1(a) provides that a trial court shall grant a new trial if, "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." A "miscarriage of justice" is defined as a "pervading

A-1248-18T2

sense of 'wrongness'" that stems from a "manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, [or] a clearly unjust result." Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011) (alteration in original) (quoting Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996)).

"A jury verdict is entitled to considerable deference and 'should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice.'" Ibid. (quoting Baxter v. Fairmount Food Co., 74 N.J. 588, 597-98 (1977)). "[T]he standard for authorizing a new trial . . . requires a determination that the jury's verdict is 'contrary to the weight of the evidence or clearly the product of mistake, passion, prejudice or partiality.'" Crawn v. Campo, 136 N.J. 494, 512 (1994) (quoting Lanzet v. Greenberg, 126 N.J. 168, 175 (1991)).

We review a court's decision regarding motions for a new trial using the same standard that governs the trial court, "whether there was a miscarriage of justice under the law." T.L. v. Goldberg, 238 N.J. 218, 230-31 (2019) (quoting Hayes v. Delamotte, 231 N.J. 373, 386 (2018)). We "must give due deference

to the trial court's feel of the case."  Risko, 206 N.J. at 522 (internal quotation marks and citations omitted).

## A.

Plaintiff argues the court's "failure to fully and adequately disclose germane and critical details about its relationship with" R.C. until "after the jury returned a verdict" resulted in a miscarriage of justice.  We are unpersuaded by this argument.

During jury selections, the trial judge noted his longtime friendship with R.C. and that they "worked together in different capacities and the like over the years."  Additionally, the judge and R.C. indicated that they occasionally run into each other but, agreed they would not "speak about this matter."  During trial, the judge and R.C. noted they both encountered a mutual friend but did not mention the trial.  After the jury rendered its verdict, the judge indicated he served on a board with R.C. and that he served as mayor while R.C. served as school board president.  Thus, after the verdict, the judge simply specified the positions he and R.C. served over the years.

Plaintiff contends the judge "should have struck [R.C.] to avoid any tendency for the close relationship to influence the jury's verdict, or at the very least, should have disclosed the details of the relationship during the voir dire."

Notably, plaintiff did not request the court to remove R.C. for cause. She did not request to question R.C.'s relationship with the judge at side bar. Nor did she use a then available peremptory challenge to remove R.C.

More fundamentally, plaintiff has not alleged, much less shown, that the judge and R.C. engaged in any ex parte communications during the trial. Nor did plaintiff demonstrate that the prior relationship of the judge and R.C. had any impact on his conduct or deliberations. We are also mindful that judge was not the factfinder.

Plaintiff's claims regarding any purported effect of R.C.'s relationship with the judge amount to nothing more than shear speculation. Such unsupported conjecture does not demonstrate any untoward direct or indirect influence by either the judge or R.C. on the other jurors, much less that a miscarriage of justice occurred.

B.

Plaintiff argues the court "demonstrated severe hostility and aggression towards [p]laintiff's counsel, . . . from the commencement of the proceeding, impinging on [p]laintiff's right to a fair trial by relaying a message to the jury, through its conduct," that counsel, "and the evidence she . . . present[ed] on

[p]laintiff's behalf, was not to be trusted or was otherwise lacking." The trial record does not support this claim.

"The conduct of a trial . . . is within the discretion of the trial court." Persley v. N.J. Transit Bus Operations, 357 N.J. Super. 1, 9 (App. Div. 2003) (citing Casino Reinvestment Dev. Auth. v. Lustgarten, 332 N.J. Super. 472, 492 (App. Div. 2000)). "Exercise of that discretion is ordinarily not interfered with unless there is a clear abuse of discretion which has deprived a party of a fair trial." Ibid. (citing Daisey v. Keene Corp., 268 N.J. Super. 325, 334 (App. Div. 1993)). The Persley court further noted:

> Although great latitude is given to a trial court in the conduct of a trial, there are bounds within which the judge must stay. Mercer v. Weyerhaeuser Co., 324 N.J. Super. 290, 298 (App. Div. 1999). A judge must "conduct the trial in a fair and impartial manner, without making remarks that might prejudice a party or which are calculated to influence the minds of the jury." Cestero v. Ferrara, 110 N.J. Super. 264, 273 (App. Div. 1970), aff'd, 57 N.J. 497 (1971). A judge should never unfairly criticize or humiliate counsel, especially in front of the jury. Mercer, 324 N.J. Super. at 298. A judge's failure to abide by these guidelines "can easily prejudice a jury since it conveys the opinion of the judge as to his belief or disbelief in one side of the case." State v. Zwillman, 112 N.J. Super. 6, 21 (App. Div. 1970). Alleged misconduct by a trial judge must be reviewed within the context of the entire record in order to determine its prejudicial impact. Mercer, 324 N.J. Super. at 298.

[Persley, 357 N.J. Super. at 9-10.]

Plaintiff points to the trial judge referring to her counsel as engaging in "histrionics," calling her "a grade school child," and acting "unprofessional[ly]." Those comments were made outside the presence of the jury during the JNOV/new trial hearing. Moreover, in making the comments, the judge was responding to co-counsel's alleged facial expressions who, according to the judge, seemed displeased with a ruling. To be sure, in hindsight the judge could have and should have expressed disapproval of counsel's behavior in a more courteous and respectful manner, but we are unpersuaded the choice of words proves that plaintiff was denied a fair trial by jury.

Plaintiff also contends the judge "in a very abrupt and aggressive manner" called for side bars "telecasting to the jury his feelings concerning the issue or evidence which were overwhelmingly negative toward [p]laintiff's counsel." We find this argument to be baseless. The judge reacted similarly to counsel for both parties. Moreover, the court instructed the jury at the outset of the trial:

> So, when I make a ruling in this case, don't try to infer or guess from what ruling I make, or anything that I may say at all. Don't try and guess what my feelings are in this case. First of all, I'm going to tell you I don't have a horse in the race. I do not have feelings about this case. I do not root for either side to prevail, it's not what I do.

> So, even if you knew what my feelings were, you should disregard them because it's your decision that controls. . . . I'm not rooting for either team to win.

While the judge may have been abrupt at times, he did so either outside the presence of the jury or to halt what he perceived to be an improper question or comment by counsel.

## C.

Plaintiff argues the trial court erred by: (1) not permitting counsel to ask certain witnesses identified with defendant leading questions on direct; (2) not admitting P-31 earlier; and (3) providing curative instructions after closing arguments.

## 1.

N.J.R.E. 611 addresses the mode and order of examining witnesses and presenting evidence. "Trial judges are vested with broad discretion over the mode of interrogation to 'make the interrogation . . . effective for ascertainment of the truth[.]" State v. Bueso, 225 N.J. 193, 206-07 (2016) (first alteration in original) (quoting State v. T.E., 342 N.J. Super. 14, 29-30 (App. Div. 2001)).

The right to call an adverse party to the stand was established by N.J.S.A. 2A:81-6. The right to ask leading questions of witnesses identified with an adverse party is governed by N.J.R.E. 611(c), which provides:

> Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily, leading questions should be permitted on cross-examination. When a party calls an adverse party or a witness identified with an adverse party, or when a witness demonstrates hostility or unresponsiveness, interrogation may be by leading questions, subject to the discretion of the court.

"The purpose of N.J.R.E. 611(c) is to 'encourage testimony from the witnesses, rather than evidence resulting from the prompting of counsel.'" Bueso, 225 N.J. at 206. (quoting Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 8 on N.J.R.E. 611(c) (2015)). Moreover, the decision whether to allow leading questions is within the discretion of the trial court. N.J.R.E. 611(c).

The trial court ruled against counsel's use of leading question unless the witness became hostile or evasive. The court rejected counsel's argument that leading questions were appropriate merely because the witnesses were associated with defendant. The court explained, in part:

> Adverse doesn't mean he's on the other side. . . . [It] is the witness being hostile, not giving you answers to your questions. If he's not forthcoming then you can lead. But you have to make an application to me first . . . . [T]hat's the way I read the rule and the purpose of testimony is so that the [jury] can assess credibility. Leading questions on direct do not give the jury an opportunity to hear how he is responding. And that's why I . . . don't permit it unless . . . he attempts to evade.

Plaintiff relies on an unpublished opinion in support of her argument that she should have been permitted to ask the witnesses identified with defendant leading questions. Unpublished opinions are not precedential or binding upon any court. Trinity Cemetery Ass'n, Inc. v. Wall Twp., 170 N.J. 39, 48 (2001) (citing R. 1:36-3) (Verniero, J., concurring).

We discern no abuse of discretion by the trial court. The witnesses that plaintiff sought to examine through leading questions answered the questions posed by plaintiff's counsel directly and without hesitation. The witnesses did not demonstrate actual "hostility or unresponsiveness." Their answers were not evasive. We discern no abuse of discretion by the trial court or prejudice to plaintiff.

2.

We next address the address the admission of P-31 in evidence. N.J.R.E. 901 provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims." This rule of evidence "does not require absolute certainty or conclusive proof." State v. Mays, 321 N.J. Super. 619, 628 (App. Div. 1999). "The proponent of the evidence is only required to make a prima facie showing of authenticity." Ibid. After such a

showing is made, the evidence is admissible and the jury decides the ultimate question of authenticity. Ibid.

"A party introducing tangible evidence has the burden of laying a proper foundation for its admission." State v. Brunson, 132 N.J. 377, 393 (1993). Evidence will usually be admitted "if the court finds 'in reasonable probability that the evidence has not been changed in important respects or is in substantially the same condition as when'" the relevant event occurred. State v. Mosner, 407 N.J. Super. 40, 62 (App. Div. 2009) (quoting State v. Brown, 99 N.J. Super. 22, 28 (App. Div. 1968)).

Our review of a court's evidential rulings "is limited to examining the decision for abuse of discretion," Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008), "i.e., [that] there has been a clear error of judgment," Griffin v. City of East Orange, 225 N.J. 400, 413 (2016) (alternation in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). "Thus, we will reverse an evidentiary ruling only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Ibid. (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

Plaintiff initially moved for the admission of P-31 through McKeever. Defendant objected, arguing McKeever did not view the entire P-31 document during the 2014 Meeting. In sustaining defendant's objection, the court

explained plaintiff would have to establish McKeever (or another witness) had access to the entire P-31 document for its admissibility or, alternatively, the court would permit admission of the portions of P-31 that McKeever viewed. Ultimately, McKeever testified P-31 contained additional categories, including the ages of employees, which the spreadsheet used during the 2014 Meeting did not contain.

Thereafter, plaintiff unsuccessfully moved for the admission of the entire P-31 document through Deck. The court noted plaintiff did not lay the proper foundation by asking Deck whether P-31 existed, in its entirety, at the 2014 Meeting. Ultimately, Deck testified P-31 was not the spreadsheet used during the 2014 Meeting, noting the spreadsheet utilized did not contain a column for gender or age. Thereafter, the court admitted the part of P-31 in evidence after Deck testified she viewed that portion of the document, which contained the scores of the candidates, during the meeting.

The trial court did not abuse its discretion in finding plaintiff failed to establish a proper foundation because plaintiff did not show P-31 "ha[d] not been changed in important respects or is in substantially the same condition as when" the relevant event, the 2014 Meeting, occurred. Mosner, 407 N.J. Super. at 62 (quoting Brown, N.J. Super. at 28). Both Mckeever and Deck testified P-

31 contained an additional criterium—the age of the candidates being scored—not contained in the spreadsheet used during the 2014 Meeting.

During trial, defendant represented the 2014 Meeting occurred in April, before the additional categories were implemented. Ramashala testified she incorporated the additional criteria after the 2014 Meeting took place. Notably, the court admitted P-31, in its entirety, after plaintiff properly laid a foundation through Ramashala. Accordingly, we find no abuse of discretion in denying the admission of P-31 until plaintiff laid the proper foundation, and no clear miscarriage of justice since the scores were admitted in evidence during Deck's testimony and the entire document was ultimately admitted in evidence during Ramashala's testimony.

3.

Plaintiff argues the court's curative instructions—regarding (1) counsel's comment regarding the 2013 performance review during her closing argument; (2) the supposed retaliation by Yilmaz; and (3) the "David versus Goliath" metaphor—were "inappropriate and inaccurate," resulting in a miscarriage of justice. We disagree.

Whether a curative instruction is warranted, as well as the language used, is within the discretion of the trial judge "who has the feel of the case and is best

equipped to gauge the effect of a prejudicial comment on the jury in the overall setting." State v. Winter, 96 N.J. 640, 647 (1984). "The adequacy of a curative instruction necessarily focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached." Ibid.

In response to plaintiff's reading from the 2013 performance review, the court instructed the jury to disregard it because it was "not in evidence." In fact, the 2013 performance review was not admitted into evidence. To the extent plaintiff contends the court erred in instructing the jury to disregard the "commendable" rating included in P-31, the error, if any, is harmless. The 2013 performance review pertained to plaintiff's UPA position; the testimony did not focus upon plaintiff's UPA skills but rather her lack of GA skills.

Plaintiffs remaining two arguments are meritless. The second curative instruction about retaliation properly reminded the jury that plaintiff's claim was limited to age discrimination and did not include a claim for retaliation. Finally, regarding the "David versus Goliath" metaphor, the court properly instructed the jury that individuals and corporations, are "entitled to the same rights and the same privileges." Trial courts regularly instruct juries that in terms of determining liability, corporations are to be treated the same as individuals. We discern no error in either curative instruction.

A-1248-18T2

Because we have rejected each of plaintiff's arguments, we also reject her claim that she is entitled to a new trial based on cumulative error.

To the extent we have not specifically addressed any of plaintiff's arguments it is because we find them to have insufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION